UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>  Plaintiff,<br>  v.<br>BRIAN BRODERICK,<br>  Defendant. | Case No.  5:22-cr-00251-EJD-1<br><br>**ORDER GRANTING MOTION TO SUPPRESS**<br><br>Re: Dkt. No. 71 |

Before the Court is a motion to suppress evidence filed by Defendant, Brian Broderick ("Defendant").  Mot. to Suppress, ECF No. 71.  The United States of America ("Government") filed an opposition, and Defendant filed a reply.  Opp'n, ECF No. 78; Reply, ECF No. 83.  The Court heard oral arguments from both Parties on January 9, 2024.  ECF No. 89.  For the following reasons, the Court **GRANTS** the motion to suppress in part and defers ruling in part.

I. **BACKGROUND**

Defendant is charged in a one count indictment with communicating a threat to injure via interstate commerce in violation of 18 U.S.C. § 875(c).  Indictment, ECF No. 7.

Defendant moves to suppress all evidence gathered as a result of three different searches and seizures executed by law enforcement in the months leading up to his arrest for this offense, and the days following.  Specifically, Defendant requests that the Court suppress: (1) the gun, ammunition, and holsters seized as a result of the March 11, 2022 traffic stop, as well as any statements made during the stop; (2) all evidence stemming from the FBI's warrantless search of Defendant's real-time location data leading up to his June 3, 2022 arrest, including any statements made by Defendant and any evidence found on Defendant's person and in his vehicle; and (3) the

body armor, ballistic plates, ammunition, bb gun, gun safe, and electronic devices seized from storage unit pursuant to the June 3, 2022, and June 8, 2022 search warrants.  Mot. to Suppress.

### A.      March 11, 2022, Traffic Stop

Defendant is a former Apple software engineer.  Mot. to Suppress 1.  On December 22, 2021, the Santa Cruz County Superior Court granted the Santa Cruz Police Department's ("SCPD") petition for a temporary Gun Violence Restraining Order ("GVRO") against Defendant.  Mot. to Suppress, Ex. A, ECF No. 71-1.  In its petition, the SCPD stated that it believed Defendant was in the midst of a mental health crisis based on calls from Apple employees and other community members alleging threatening and erratic emails, as well as calls from Defendant alleging that Apple was trying to harm him.  *Id.* at 12.  In January 2022, the Santa Cruz County Sheriff's Office ("Sheriff's Office") was tasked with serving Defendant the GVRO.  Deputy Moreno Decl. ("Moreno Decl.") ¶ 5, ECF No. 78-1 at 67–71.

On March 10, 2022, Deputy Sheriff Hugo Moreno ("Deputy Moreno") from the Sheriff's Office states that he called Defendant and asked Defendant to come to the Sheriff's Office and surrender his firearm.  *Id.* ¶ 10.  Defendant allegedly declined.  *Id.*  According to the incident report, the next day, on March 11, 2022, Defendant called Deputy Moreno and informed him that he was in the Sheriff's Office parking lot.  *Id.* ¶ 11; Mot. to Suppress, Ex. C, ECF No. 71-3.  Deputy Moreno states that he looked outside and saw Defendant's car drive away.  Moreno Decl. ¶ 11.  There was no attempt to serve Defendant in the parking lot.  *See id.*  It is unclear how long Defendant was in the Sheriff's Office parking lot.  *See id.*  Soon after, three members of the Sheriff's Office, Detective Sergeant Ryan Fulton ("Deputy Fulton"), Detective Joshua McKim ("Deputy McKim"), and Deputy Moreno followed Defendant in his vehicle and pulled him over.  *Id.* ¶ 12.

The body worn camera ("body cam") footage reveals the sequence of events that followed.  At 4:34 p.m., Deputy McKim approaches Defendant's vehicle on the passenger side to initiate the stop.  Opp'n, Ex. 4 ("McKim Body Cam"), at 16:34:52.  Deputy McKim informs Defendant that he is being pulled over for driving without a front license plate.  *Id.*  Deputy Fulton approaches the

Case No.:   5:22-cr-00251-EJD-1
ORDER GRANTING MOTION TO SUPPRESS

2

vehicle on the driver's side approximately 20 seconds later, pulls Defendant out of his car, and holds him in place while Deputy Moreno handcuffs him. Mot. to Suppress, Ex. D ("Fulton Body Cam"), at 16:35:11. Deputy Fulton proceeds to question Defendant about narcotics and informs Defendant that he is being pulled over for expired registration tags. *Id.* At 4:37 p.m., Deputy McKim begins patting down Defendant, removing his wallet and a charging cable from his pocket. McKim Body Cam. at 16:37:22. At 4:39 p.m., Deputy McKim begins conducting a variety of field sobriety tests. *Id.* at 16:39:00.

By approximately 4:43 p.m., Deputy Moreno appears ready to serve the GVRO. Moreno Body Cam. at 16:43:21. Deputy Moreno has finished his review and preparation of the paperwork and appears to have received permission from his supervisor to serve the GVRO over the phone.[1] *Id.* At 4:45 p.m., Deputy Moreno tells Deputy Fulton that he is ready to serve the GVRO and informs Deputy Fulton that he will serve Defendant once Deputy Fulton is done with him. Moreno Body Cam. at 16:45:02. However, Deputy McKim and Deputy Fulton continue to conduct a variety of sobriety tests and talk to Defendant for approximately ten more minutes. *See id.*

At 4:55 p.m., approximately twenty minutes into the stop, Deputy Moreno finally serves Defendant with the GVRO. Moreno Body Cam. at 16:55:22. Shortly after, Deputy Fulton asks Defendant where he keeps his firearm, to which Defendant replies that it is in his storage unit. Fulton Body Cam. at 16:56:21. Still handcuffed, upon request from the deputies, Defendant gives consent for the deputies to retrieve the gun from the storage unit. *Id.* at 16:59:13.

At 4:59 p.m., approximately twenty-five minutes into the stop, Deputy Moreno removes the handcuffs from Defendant. Moreno Body Cam. at 16:59:59. The deputies and Defendant begin to leave for the storage unit at approximately 5:02 p.m. *Id.* at 17:02:38. Defendant rides in the deputies' car with them to the storage unit, where Defendant points out the gun bag to the deputies, and the deputies seize the gun, along with ammunition and gun holsters. *Id.* at 17:02:38–

---

[1] The Government asserts that Deputy Moreno was also speaking with his supervisor regarding serving another out-of-county restraining order as well. Opp'n 2.

Case No.: 5:22-cr-00251-EJD-1
ORDER GRANTING MOTION TO SUPPRESS
3

17:27:27.

At 5:41 p.m., approximately one hour and seven minutes after the initiation of the stop, the deputies return Defendant to his car. *Id.* at 17:41:44.

Notably, at no time does the body cam footage show any deputy investigating the traffic violation for which they pulled over Defendant (i.e., running his license plate, asking for his ID and registration, etc.).

### B. Real-Time Location Data Tracking Leading to June 3, 2022, Arrest

Unrelated to the March 11 stop, on June 2, 2022, the FBI obtained an arrest warrant as a result of emails Defendant allegedly sent to agents at the FBI San Francisco Division, including an email sent on June 1, 2022, stating that he is "an American who is literally hunting an idiot traitor named Special Agent Christopher Salazar," and demanding that the agent "act on this in 24 hours or I go beyond taking your livelihood." *See* Criminal Compl. ¶ 20, ECF No. 1. This alleged email is the basis for Defendant's present indictment. The FBI also found YouTube videos Defendant allegedly posted, including a video of himself on June 1, 2022, taking surveillance photographs of FBI vehicles in Alabama. *Id.* ¶ 8.

To find Defendant and effectuate the arrest, the FBI took two steps beginning on June 2, 2022. First, the FBI sent an emergency disclosure request to Tesla requesting the identification number from Defendant's vehicle. *See* Mot. to Suppress, Ex. H, ECF No. 71-8. Based on this information, the FBI acquired Defendant's charging data and learned that Defendant was travelling somewhere in the Northern District of Alabama. Second, the FBI supplied AT&T the Tesla identification number to request real-time location data on Defendant's vehicle. Mot. to Suppress, Ex. I, ECF No. 71-9 at 10–11. The Government has not disclosed to Defendant the circumstances of its request to AT&T or any communications with AT&T. Declaration of Dejan M. Gantar ("Gantar Decl.") ¶¶ 10, 11, ECF No. 71-13. At no point did the FBI seek a warrant for Defendant's real-time location data.

The FBI used the data from AT&T to track Defendant and arrest him in Tuscaloosa, Alabama on June 3, 2022. Mot. to Suppress, Ex. I, ECF No. 71-9 at 10–11. During the arrest, the

Case No.: 5:22-cr-00251-EJD-1
ORDER GRANTING MOTION TO SUPPRESS
4

Government obtained statements from Defendant, as well as other evidence found on his person and in his vehicle.

### C. June 3, 2022, and June 8, 2022, Search Warrants

On June 3, 2022, the FBI obtained a search warrant in the Northern District of California from Magistrate Judge van Keulen authorizing the search of Defendant's storage unit. Mot. to Suppress, Ex. G, ECF No. 71-7. The warrant mandated that forensic search of the electronic devices must be completed within 120 days of the execution of the search warrant, and that the Government may retain a seized device for 60 days. *Id.* at 21–22. The FBI seized body armor, ballistic plates, and approximately six electronic devices. Mot. to Suppress, Ex. L, ECF No. 71-12. The electronic devices have not been searched are still in the possession of the FBI in Campbell, California. Opp'n 4.

On June 8, 2022, the FBI obtained a search warrant in the Northern District of Alabama authorizing the search of Defendant's car and the seizure and search of any electronic devices. Mot. to Suppress, Ex. J, ECF No. 71-10. This warrant also mandated that forensic search of the electronic devices must be completed within 120 days of the execution of the search warrant, and that the Government may retain a seized device for 60 days. *Id.* at 25–26. The FBI recovered multiple electronic devices, including two laptops, three iPhones, and an apple watch, in addition to ammunition, a bb gun, and a gun safe. *Id.* at 28. The electronic devices are still in the possession of the FBI's San Francisco Field Division. Opp'n 4.

The affidavits for both search warrants relied on observations gathered from the March 11 search and seizure. Mot. to Suppress, Ex. J, ECF No. 71-10 at 8–9; Mot. to Suppress, Ex. G, ECF No. 71-7 at 6.

## II. DISCUSSION

The Court will address in turn Defendant's requests to suppress evidence resulting from (1) the March 11, 2022, stop, (2) real-time location data tracking, and (3) the storage unit and vehicle warrants.

Case No.: 5:22-cr-00251-EJD-1
ORDER GRANTING MOTION TO SUPPRESS
5

### A. March 11, 2022, Traffic Stop

Defendant argues that the March 11, 2022, search and seizure constituted an unlawful prolonged detention and a de facto arrest without probable cause. Mot. to Suppress 9–13. Defendant argues that the prolonged detention and/or de facto arrest tainted Defendant's consent to search his storage unit, and his consent was not voluntary given the coercive nature of the detention. *Id.* Accordingly, Defendant requests that the Court suppress all evidence resulting from the March 11 stop, including the gun, ammunition, and holsters seized from the storage unit, as well as any statements or observations made during the stop. *Id.*

#### 1. Prolonged Detention

Fourth Amendment seizures are generally "reasonable" if they are based on probable cause to believe that the individual has committed a crime. *Dunaway v. New York*, 442 U.S. 200, 213 (1979). It is well-established that temporary detention of motorist who the police have probable cause to believe has committed civil traffic violation does not violate the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 810–11 (1996). Traffic detentions, however, may not extend indefinitely. *See Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (holding that absent reasonable suspicion, police extension of a traffic stop—beyond determining whether to issue a traffic ticket—violates the Fourth Amendment). Under *Rodriguez* and its progeny, a traffic stop is "unnecessarily long" if it extends beyond its "mission" to address the traffic violation that warranted the stop and attend to related safety concerns. *Id.* If the stop is "unnecessarily long," the officers must have a reasonable suspicion of other criminal activity to justify the continued detention. *Id.*

Here, the deputies state that they pulled over Defendant because of a traffic violation; however, there is no evidence that the deputies carried out any action in furtherance of their purported mission to address the traffic violation whatsoever. At no point did the deputies ask Defendant for his license and registration, conduct any search of his vehicle record, or ask Defendant any questions regarding the traffic violation. While it is true that a pre-textual stop is not necessarily a Fourth Amendment violation, *Whren v. United States*, 517 U.S. 806, 813–14

Case No.: 5:22-cr-00251-EJD-1
ORDER GRANTING MOTION TO SUPPRESS
6

1  (1996), the fact that the deputies failed to conduct a single action necessary to investigate the

2  traffic incident unavoidably means that the traffic stop is "unnecessarily long."

3        The Court is unpersuaded by the Government's proposed justifications for prolonging the

4  stop.

5        First, the Government argues that the deputies prolonged the stop because they reasonably

6  suspected that Defendant was driving under the influence. Opp'n 6. However, while Deputy

7  Fulton states in the incident report that Defendant was twitching, fidgeting, fluttering his

8  eyelashes, and excessively sweating consistent with a person under the influence of narcotics, the

9  body cam footage does not support these observations. At no point is Defendant seen exhibiting

10 the behaviors that Deputy Fulton stated in the incident report. The body cam footage instead

11 shows that Deputy Fulton almost immediately accused Defendant of being under the influence of

12 methamphetamine within twenty seconds of pulling him out of the car, without spending much

13 time observing him at all. *See* Fulton Body Cam. at 16:35:11, 16:35:27. But regardless of

14 whether the deputies' suspicion that Defendant was under the influence was objectively

15 reasonable, the Government has failed to supply any justification for taking approximately sixteen

16 minutes to conduct the sobriety tests necessary to confirm that suspicion.

17       Second, the Government argues that the stop was prolonged because the deputies needed

18 to serve the GVRO. Opp'n 6. However, the GVRO was not served until approximately twenty

19 minutes into the stop. While serving the GVRO may have been a valid reason to prolong the stop

20 beyond the time necessary to investigate the traffic incident, the deputies had plenty of opportunity

21 to serve the GVRO in the twenty minutes prior that Defendant was handcuffed.

22       Third, the Government argues that the stop was prolonged to protect the deputies' safety—

23 the deputies knew Defendant owned a gun and had a restraining order related to his ownership of

24 this gun. Opp'n 6. Again here, while this may have been a valid reason to delay the stop, the

25 deputies conducted their safety check in the first few minutes of the stop. The deputies

26 immediately removed Defendant from the car, handcuffed him, questioned him on whether he

27 possessed any firearms, and patted him down soon after. With Defendant outside of his car and

28 Case No.: 5:22-cr-00251-EJD-1
ORDER GRANTING MOTION TO SUPPRESS
7

determined to not be carrying a weapon, the deputies had no valid safety justification for keeping him handcuffed for approximately twenty-five minutes.

Finally, the Government indicated during the motion hearing that the stop was prolonged because Defendant was argumentative. While it is true that a contentious exchange between Defendant and the deputies ensued throughout the stop, there is no evidence that there was any traffic investigation taking place at all, or any other valid justification for prolonging the stop; therefore, there was nothing that his conduct could have prolonged. Further, Defendant was primarily speaking with Deputy Fulton and Deputy McKim, not the officer in charge of carrying out the traffic investigation and serving the DVRO, Deputy Moreno. There was nothing preventing Deputy Moreno from conducting the traffic investigation and DVRO service in a timely manner. *See, e.g., People v. Ayon*, 80 Cal. App. 5th 926, 939–40 (Cal. Ct. App. 2022), *as modified on denial of reh'g* (Aug. 3, 2022), *review denied* (Oct. 19, 2022) ("Regardless, nothing Ayon said to Officer Williams prolonged the length of the investigation into the traffic infractions. It was Officer Burnett—not Officer Williams—who was in charge of conducting the records check.").

The Court finds that detaining Defendant in handcuffs for approximately twenty-five minutes without any reasonable suspicion to justify extending the stop to that extent constitutes a prolonged detention in violation of the Fourth Amendment.

### 2. De Facto Arrest

The Court also finds that the stop constituted a de facto arrest without probable cause. An investigatory detention can turn into a de facto arrest when it goes beyond a temporary detention lasting longer than is necessary to effectuate the purpose of the stop. *United States v. I.E.V.*, 705 F.3d 430, 440 (9th Cir. 2012); *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). Determining when an investigatory detention becomes a de facto arrest is subject to a totality of circumstances analysis which includes the intrusiveness of the stop and the justification for the use of such tactics, i.e., whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken. *Washington v. Lambert*, 98 F.3d 1181, 1188 (9th Cir. 1996).

Case No.: 5:22-cr-00251-EJD-1
ORDER GRANTING MOTION TO SUPPRESS

8

Here, Defendant was in handcuffs for approximately twenty-five minutes. There is no question that a reasonable person would not feel free to leave while handcuffed and being questioned by three Sheriff's Office deputies. And as discussed above, there were no safety concerns to warrant the prolonged handcuffing beyond the time necessary to ascertain whether Defendant was carrying a weapon. The Government did not reply to Defendant's argument here and has not presented the Court with any evidence that the deputies had probable cause to warrant a de facto arrest.

### 3. Fruit of the Poisonous Tree

Now that the Court has found the stop to be an unconstitutional prolonged stop and de facto arrest, the Court will analyze how much evidence has been tainted as a result. *United States v. Washington*, 490 F.3d 765, 774 (9th Cir. 2007) (holding that evidence obtained subsequent to a violation of the Fourth Amendment is tainted by the illegality and is inadmissible, despite a person's voluntary consent, unless the evidence obtained was purged of the primary taint) (citing *Wong Sun v. United States*, 371 U.S. 471, 488 (1963) ("The question in a ['fruit of the poisonous tree'] case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." (internal quotation marks omitted))

Here, all statements and observations made during the stop are tainted by the illegality and therefore suppressed. Defendant also gave consent to search his storage unit while handcuffed, approximately twenty-four minutes into the stop. There were no intervening circumstances to purge the taint's effect on his consent; therefore, all evidence from the storage unit, including the deputies' observations, must be suppressed. This includes the deputies' observations of the storage unit that were later included in the affidavits seeking search warrants for Defendant's storage unit and vehicle.

The Court finds unpersuasive the Government's argument that the deputies would have inevitably discovered the evidence in the storage unit despite the constitutional violation. The Government argues that Defendant was required by law to surrender his firearm, so if he did not

Case No.: 5:22-cr-00251-EJD-1
ORDER GRANTING MOTION TO SUPPRESS
9

get his consent to search his storage unit, they would have acquired a warrant to do so regardless. Opp'n 8; *see also United States v. Camou*, 773 F.3d 932, 943 (9th Cir. 2014) (holding that the inevitable discovery doctrine provides an exception to the exclusionary rule where the Government can establish by a preponderance of the evidence that the information "ultimately or inevitably would have been discovered by lawful means"). However, the inevitable discovery doctrine does not apply when, as here, officers have probable cause to apply for a warrant but fail to do so. *See Camou*, 773 F.3d at 943; *see also United States v. Ayala*, 646 F. Supp. 3d 1191, 1197–98 (N.D. Cal. 2022) (citing *United States v. Mejia*, 69 F.3d 309, 320 (9th Cir. 1995) ("To apply the inevitable discovery doctrine whenever the police could have obtained a warrant but chose not to would in effect eliminate the warrant requirement.")).[2]

### B. Real-Time Location Data Tracking Leading to June 3, 2022, Arrest

Defendant argues that the real-time location data tracking, or cell-site location information ("CSLI"), used to effectuate his June 3, 2022, arrest constituted an unlawful warrantless search. Mot. to Suppress 14–15. Defendant argues that the unlawful search tainted the evidence obtained from the arrest, including Defendant's statements and other evidence found on his person and in his vehicle. *Id.* The Government first argues that the Fourth Amendment is not implicated in its real-time CSLI tracking. Opp'n 10–12. Alternatively, the Government argues that the FBI lawfully obtained the data from Tesla and AT&T under the Stored Communications Act ("SCA"), and the warrantless search was justified by exigent circumstances and the good faith exception. *Id.*

The Court is inclined to grant Defendant's motion to dismiss any evidence obtained as the result of the warrantless real-time CSLI tracking.

First, regarding the Government's argument that the Fourth Amendment is not implicated in its real-time CSLI tracking, it is well-established that individuals have a reasonable expectation

---

[2] The Court also questions whether the deputies would have been able to acquire a warrant because the service of the GVRO was invalid given the Santa Cruz Police Department's request to continue the GVRO proceedings for lack of proper service. Mot. to Suppress 5.

Case No.: 5:22-cr-00251-EJD-1
ORDER GRANTING MOTION TO SUPPRESS
10

of privacy in their historical CSLI under the Fourth Amendment. *See, e.g., Carpenter v. United States*, 138 S. Ct. 2206 (2018) (holding that "an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CLSI"). Although *Carpenter* addressed only historical CSLI, many courts in this District and across the country have found that "its reasoning applies to real-time CSLI." *State v. Muhammad*, 194 Wash. 2d 577, 590 (2019) (en banc); *see also United States v. Ellis*, 270 F. Supp. 3d 1134, 1148 (N.D. Cal. 2017); *In re: Application for Tel. Info. Needed for a Criminal Investigation*, No. CR-15-9030-MISC (HRL), 4/9/2015 Order, ECF 2 at 5; *State v. Sinapi*, 295 A.3d 787, 804 (R.I. 2023) ("[W]e perceive no meaningful distinction between the privacy issues related to historical and real-time CSLI."); *United States v. Baker*, 563 F. Supp. 3d 361, 382 (M.D. Pa. 2021) (same). Further, while the Government suggested during the hearing that the FBI's real-time CSLI search was comparable to any traditional surveillance method used on public roads, the Court does not have the information necessary to reach that conclusion. The Court does not know what data the FBI acquired, how they acquired it, where they tracked Defendant, or for how long they tracked Defendant due to the Government's failure to supply Defendant with that information. The Government bears the burden of showing that a warrantless search or seizure does not violate the Fourth Amendment. *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012). By failing to provide this information, the Government failed to meet its burden to show that there was no reasonable expectation of privacy specifically in the data it searched.

Second, regarding the Government's argument that the warrantless search was justified under the SCA, the Court is inclined to follow the logic of other courts in this District who have found that warrantless searches of *real-time* data, as opposed to *stored* data, is not protected under the SCA. *See, e.g., United States v. Ellis*, 270 F. Supp. 3d 1134, 1148 (N.D. Cal. 2017) ("[P]rovisions of the pen register statute and the SCA do not authorize the use of a CSS to disclose real-time information about a cell phone user's physical location, and that such location monitoring must be authorized by a showing of probable cause."); *United States v. Cooper*, 2015 WL 88157, *5 (N.D. Cal. Mar. 2, 2015) (finding Congress intended "that the SCA was to be used

as a means to obtain data which has already been stored at the time the government seeks to obtain it"); *United States v. Espudo*, 954 F. Supp. 2d 1029, 1036 (S.D. Cal. 2013) (finding that "[n]othing in the SCA contemplates a new form of ongoing surveillance").

Third, regarding the Government's argument that the FBI relied in good faith on the SCA, the Court observes that there are numerous cases warning the FBI that real-time CSLI is not data contemplated under the SCA. *See, e.g., Cooper*, 2015 WL 88157, at *5; *Espudo*, 954 F. Supp. 2d at 1036. More importantly, however, there is no evidence that the FBI relied on the SCA at all. The SCA is not cited in its communications with Tesla, and the Court cannot make the determination of what the agents relied on in obtaining the information from AT&T because the Government has failed to provide the agents' communications with AT&T or any other details of the exchange.

Finally, regarding the Government's argument that the warrantless search was justified due to exigent circumstances, the Court does not see an immediate threat to the San Francisco agent demonstrating a situation so compelling as to justify a warrantless search. While Defendant allegedly threatened an agent in San Francisco via email, the FBI was aware that Defendant was not in proximity to the San Francisco agent—Defendant's YouTube video showed him in Alabama just one day prior to the FBI's requests to Tesla and AT&T.

However, regardless of these concerns with the Government's arguments, the Court questions whether the evidence resulting from the arrest would even be admissible under Federal Rule of Evidence 401 and 403. The Court fails to see at this stage how the evidence stemming from the June 3, 2022, arrest, such as the body armor Defendant wore at the time of his arrest, would be relevant to his accused act of sending a threatening email—or further, how its probative value would outweigh potential prejudice.

The Court therefore defers ruling on this issue at present. The Parties are welcome to raise the issue in any pre-trial filings should the Government seek to introduce evidence resulting from the arrest at trial.

### C. Storage Unit and Vehicle Warrants

Finally, Defendant argues that the evidence obtained as a result of the June 3, 2022, and

Case No.: 5:22-cr-00251-EJD-1
ORDER GRANTING MOTION TO SUPPRESS
12

June 8, 2022, warrants should be suppressed because the warrants relied on unlawfully obtained information from the March 11, 2022, stop, the property has been retained past the time allowed in the warrants, and the warrants were too broad.

As the Court discussed in the January 9, 2023, hearing, the Court will also defer ruling on this issue. With the benefit of the Court's ruling that any information obtained from the March 11, 2022, stop must be excised from the warrant affidavits, the Court authorized supplemental briefing as to whether the warrants withstand review after those statements are excised. The Court will address any supplemental briefings during upcoming pre-trial hearings.[3]

## III. CONCLUSION

The Court **GRANTS** the motion to suppress the information obtained pursuant to the March 11, 2022, prolonged detention and de facto arrest, including the observations, materials, objects, and any other evidence that flows from the stop. The Court defers ruling on the motion to suppress the information obtained pursuant to the warrantless search of Defendant's real-time CLSI and the evidence obtained from the June 3, 2022, and June 8, 2022, warrants.

**IT IS SO ORDERED.**

Dated: January 25, 2024

EDWARD J. DAVILA
United States District Judge

---

[3] The Court is in receipt of ECF Nos. 102 and 113 and will discuss these filings with the Parties at the scheduled February 12, 2024, hearing.

Case No.: 5:22-cr-00251-EJD-1
ORDER GRANTING MOTION TO SUPPRESS
13